**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DAVID DOWE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No.  3:12-CV-2039-M (BH) |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated July 26, 2013, this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed November 5, 2012 (doc. 18), and *Defendant's Motion for Summary Judgment*, filed January 4, 2013 (doc. 21).  Based on the relevant filings, evidence, and applicable law, the plaintiff's motion is **GRANTED in part,** the defendant's motion is **DENIED,** and the case is **REMANDED** for further proceedings.

## I.  BACKGROUND[1]

### A.    Procedural History

David Dowe (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying his claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.  (Doc.  1 at 1-2.)  Plaintiff applied for DIB and SSI on October 3, 2007, alleging disability beginning April 1,

---

[1] The background comes from the transcript of the administrative proceedings, which is designated as "R."

2005, due to severe depression and severe laryngitis. (R. at 403, 537.) His claims were denied initially and upon reconsideration. (R. at 421–30.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on February 25, 2008. (R. at 403.) On June 3, 2009, the ALJ issued a decision finding Plaintiff not disabled. (R. at 403–11.) Plaintiff appealed and the Appeals Council vacated the ALJ's decision and remanded the case. (R. at 413–15.) A second hearing was held on November 3, 2010, at which Plaintiff testified. (R. at 326.) The ALJ again found Plaintiff not disabled. (R. at 116–24.) The Appeals Council denied his request for review on May 23, 2012, making the ALJ's decision the final decision of the Commissioner. (R. at 1–4.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

## B.    Factual History

### 1.    Age, Education, and Work Experience

Plaintiff was born in 1965, and was 45 years old at the time of the hearing before the ALJ. (R. at 329.) He completed the eleventh grade and has past relevant work as a cook. (R. at 329–31.)

### 2.    Medical, Psychological, and Psychiatric Evidence

On September 20, 2007, psychiatrist Bharat Patel at Dallas Metrocare Services (Metrocare) completed a psychiatric diagnostic interview exam of Plaintiff. (R. at 674.) Plaintiff reported a history of depression for the prior 10 years. (R. at 675.) He had turned to drugs and alcohol to make him feel better, but had stopped drinking alcohol for about four to five months and stopped doing drugs for about three to four months. (*Id.*) He also had attended Alcoholics Anonymous in the past and had been to an inpatient rehabilitation program about four years prior to the exam. (*Id.*) Plaintiff reported increased feelings of depression, but denied any suicidal or homicidal ideations.

(*Id.*)  Dr.  Patel observed that Plaintiff was cooperative with organized thought process, fair insight, and good judgment.  (R. at 575–76.)  He did not observe any sign of psychotic features, which Plaintiff also denied.  (*Id.*)  Dr.  Patel noted that Plaintiff's mood was depressed, anxious, and irritable, and his attention was impaired.  (R. at 675.)  He assigned Plaintiff a GAF[2] score of 45 and diagnosed him with major depressive disorder and cocaine dependence.  (R. at 676.)

On November 29, 2007, Plaintiff admitted to his case worker at Metrocare that he had relapsed and used a "harmful substance" in the prior two weeks.  (R. at 812.)  He also complained that his medications were not working, reported that he lost his medications, and requested that they be refilled.  (R. at 814.)

On December 10, 2007, S.A. Somodevilla, Ph.D., a psychological consultant, completed a psychological evaluation.  (R. at 714–17.)  He found that Plaintiff's thought process exhibited no evidence of a thought disorder, his memory was not impaired, he reported no visual or auditory hallucinations, and his judgment and insight were fair.  (R. at 716.)  Plaintiff admitted to suicidal ideation without planning and being depressed, and he sometimes drifted and lost focus.  (*Id.*)  The diagnoses were major depressive disorder and cocaine dependence.  (*Id.*)  Dr. Somodevilla assigned Plaintiff a GAF score of 52[3] and concluded that his prognosis was fair.  (R. at 716-17.)

On December 18, 2007, Michele Chappuis, Ph.D., a state agency medical consultant (SAMC), reviewed Plaintiff's treatment records and completed a Psychiatric Review Technique

---

[2]  GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 31–40 indicates "[s]ome impairment in reality testing or communication" or a "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) p. 34 (4th ed. 1994).

[3]  A GAF score of 51 to 60 indicates moderate symptoms or "moderate difficulty in social, occupational, or school functioning."  DSM–IV-TR, p. 34.

form (PRTF).  (R. at 720–33.)  Dr.  Chappuis diagnosed Plaintiff with major depressive disorder and

cocaine dependence.  (R. at 723, 728.)  She opined that Plaintiff had moderate restrictions on daily

living activities, maintaining social functioning, and maintaining concentration, persistence, or pace.

(R. at 730.)  She found Plaintiff had experienced no episodes of decompensation of extended

duration.  (*Id.*)  She concluded that Plaintiff "[was] somewhat limited by memory and concentration

but the impact of these symptoms [did] not wholly compromise [Plaintiff's] ability to function

independently, appropriately and effectively on a sustained basis," and his "alleged limitations

[were] not fully supported" by the medical and other evidence of record.  (R. at 732.)

Dr.  Chappuis also completed a mental Residual Functional Capacity (RFC) assessment.  (R.

at 734–37.)  She opined that Plaintiff was moderately limited in 10 mental work-related abilities,

including understanding, remembering, and carrying out detailed instructions; and was not

significantly limited in 10 abilities, including asking simple questions and responding appropriately

to changes in the work setting.  (*Id.*)  Dr. Chappuis concluded that Plaintiff retained the mental RFC

to "understand, remember, and carry out detailed but not complex instructions, make decisions,

attend and concentrate for extended periods, accept instructions, and respond appropriately to

changes in [a] routine work setting."  (R. at 736.)

On February 5, 2008, Nancy Wilson, Ph.D. reviewed the medical records and affirmed Dr.

Chappuis's December 18, 2007 assessment.  (R. at 747.)

Plaintiff saw Joel Holiner, M.D., a psychiatrist, on August 11, 2008, for an initial psychiatric

evaluation.  (R. at 767–69.)  Dr.  Holiner found Plaintiff was cooperative, oriented, and cognitively

grossly intact.  (R. at 767.)  His thought process was coherent and organized, his judgment and

insight were good, and he had no hallucinations or delusions.  (*Id.*)  His mood, concentration,

energy, and motivation were poor.  (*Id.*)  Dr. Holiner diagnosed him with major depressive disorder

without psychosis and assigned him a GAF score of 45.  (R. at 769.)

On August 31, 2008, police officers took Plaintiff to Parkland Hospital Emergency Room.

(R. at 981.)  He had been missing since August 24, 2008.  (R. at 984.)  Plaintiff removed a crack

pipe from his rectum, and a treating physician concluded he had been on a prolonged crack binge.

(R. at 981, 984.)  His primary diagnosis at discharge was cocaine dependence.  (R. at 982.)

Plaintiff began reporting auditory hallucinations to Dr. Arthur Chavason and Dr. Holiner on

October 2, 2008, and they consistently diagnosed him as having major depressive disorder with

psychosis.  From October 2, 2008 through July 16, 2009, they also assigned him a GAF score of 45.

(R. at 1003–13.)

On March 17, 2009, George Mount, a psychological consultant, conducted a clinical

interview and mental status examination of Plaintiff.  (R. at 962.)  Plaintiff reported auditory and

visual hallucinations, as well as suicidal thoughts.  (R. at 962.)  Dr. Mount observed that Plaintiff

was coherent, his conversation was relevant, his thought process was goal-directed, and his remote

memory was intact.  (*Id.*)  Plaintiff's mood was labile, his affect was depressed and anxious, and his

recent memory was impaired.  (*Id.*)  Dr. Mount diagnosed him with schizoaffective disorder,

posttraumatic stress disorder, and dependent personality disorder, and assigned him a GAF score

of 40.  (R. at 964.)  Dr. Mount also noted that the test results from Millon Clinical Multiaxial

Inventory-III (MCMI-III) report[4] were consistent with his diagnoses.  (R. at 963.)

---

[4]  The MCMI-III report stated that Plaintiff's possible Axis I diagnoses were schizoaffective disorder, adjustment disorder with anxiety, and posttraumatic stress disorder.  (R. at 966.)  For Axis II, the suggested diagnoses were dependent personality disorder, avoidant personality disorder with depressive personality traits, and self -defeating personality traits.  (*Id.*)  The report noted, however, that Plaintiff's "responsive style may indicate a tendency to magnify illness, an inclination to complain or feelings of extreme vulnerability associated with a current episode of acute turmoil. [Plaintiff's] scale scores may be somewhat exaggerated, and the interpretations should be read with this in mind."  (*Id.*)

Dr. Mount also completed a psychiatric/psychological impairment questionnaire. (R. at 772–79.) He opined that Plaintiff was "markedly limited" in 13 mental work-related abilities, including understanding, remembering, and carrying out detailed instructions; and was moderately limited in 6 abilities, including asking simple questions and requesting assistance. (R. at 775–77.) He further opined that Plaintiff was incapable of tolerating even "low stress" at work, would more than likely be absent from work more than three times a month, and his impairments would last at least 12 months. (R. at 772–79.)

On March 26, 2009, Dr. Chavason submitted a disability letter opining that Plaintiff was "totally disabled without consideration of any past or present drug and/or alcohol use", and that drug or alcohol use was "not a material cause of [Plaintiff's] disability." (R. at 976.)

On April 3, 2010, Plaintiff returned to Metrocare to renew his prescription, claiming that his medications were stolen from his car. (R. at 1080.) A few days later, he was jailed and received substance abuse treatment from the Dual Diagnosis Center. (*See* R. at 1059, 1075, 1131–33.) Plaintiff's diagnoses at discharge were schizoaffective disorder and cannabis and cocaine dependence. (R. at 1131–22.) He was assessed a GAF score of 45. (*Id.*)

Psychiatrist Gary Lefkof, with LifeNet Behavioral Health (LifeNet), began treating Plaintiff on September 15, 2010. (R. at 1193–94.) Dr. Lefkof completed a psychiatric evaluation, diagnosed Plaintiff with cannabis and cocaine dependence in remission, and assigned him a GAF score of 43. (*Id.*) Dr. Lefkof also noted Plaintiff's depression. (R. at 1193.)

On October 19, 2010, Jason Carter, a qualified mental health professional (QMHP) at LifeNet, jointly signed a letter with Dr. Lefkof stating that Plaintiff was diagnosed with schizoaffective disorder on September 15, 2010, and that he "experience[d] mood swings,

concentration deficits, and short term memory issues which [made] it difficult for him to work." (R. at 1196.)

Dr. Lefkof authored another letter on October 28, 2010, stating Plaintiff's diagnosis of schizoaffective disorder. (R. at 1204.) He stated that Plaintiff had completed a drug treatment program, was attending group sessions at LifeNet five days a week and a peer support group weekly, was "consistent with all [his] weekly obligations at LifeNet," and was keeping his probation appointments. (Id.) Dr. Lefkof stated that Plaintiff's "inability to work [was] due to his mental illness along with his strenuous schedule . . . which [was] part of working toward recovery." (Id.)

On November 1, 2010, Dr. Lefkof completed a Mental Impairment Questionnaire. (R. at 1197–1202.) He diagnosed Plaintiff with schizoaffective disorder and assessed him a GAF score of 43. (R. at 1197.) He indicated that the severity of Plaintiff's disorder was evidenced by auditory and visual hallucinations, insomnia, inability to focus, mood swings, depression, and anxiety. (Id.) In addition, Plaintiff suffered from multiple symptoms, such as anhedonia, insomnia, decreased energy, and difficulty concentrating. (R. at 1198.) He opined that Plaintiff was markedly limited in his activities of daily living and maintaining social functioning; was extremely limited in maintaining concentration, persistence, and pace; and had experienced four or more episodes of decompensation. (R. at 1199.) He opined that Plaintiff had "no useful ability" in 14 work-related mental functions, including remembering work-like procedures and maintaining attention for a two-hour segment; and was "unable to meet competitive standards" in 10 functions, including understanding, remembering, and carrying out very short and simple instructions. (R. at 1200–01.) He anticipated that Plaintiff's disorder and treatment would cause him to be absent from work daily. (R. at 1201.) He also indicated that Plaintiff had "no" "substance abuse issues." (R. at 1203.)

### 3.      Hearing Testimony

On November 3, 2010, Plaintiff, a medical expert, and a vocational expert testified at a hearing before the ALJ.  (R. at 326-62.)  Plaintiff was represented by an attorney.  (R. at 326.)

#### a.      *Plaintiff's Testimony*

Plaintiff testified that he was 45 years old and had worked as a cook previously.  (R. at 329-31, 335.)  He testified that the onset date of disability was April 1, 2005.  (R. at 336.)

Plaintiff had some trouble walking due to dizziness, which he attributed to medications he was taking; his eyes were also getting bad due to the medicine.  (R. at 338.)  He could dress himself, but he sat on the couch a lot because he had no concentration and interest in anything.  (R. at 338-39.)  Plaintiff could not sit for a long time because he became nervous.  (*Id.*)  He also could not stand for a long time because he became lightheaded, again attributing this to the medicine he was taking.  (R. at 340.)  Plaintiff did not drive due to his severe mood swings and road rage.  (R. at 344-45.)  He had gotten violent in the past and broken things.  (R. at 345.)  Plaintiff could not get along with people at work, which caused him to be fired.  (*Id.*)  He preferred to be alone because he felt safe alone, and that he thought other people were out to get him.  (*Id.*)  He only went outside to see his doctor, but otherwise stayed inside.  (R. at 346-47.)  Plaintiff went to his current mental health care provider (LifeNet) daily to see his doctor or a case worker, or take some mental health classes.  (R. at 348.)

Plaintiff had auditory and visual hallucinations.  (*Id.*)  The voices told him a lot of things, but he just got more irritable.  (*Id.*)  Plaintiff also saw shadows and deceased people.  (R. at 341.)

When asked about his cocaine dependency, Plaintiff testified that he only used cocaine when he could not afford his medications because his wife's insurance lapsed.  (R. at 343-44.)  He denied

any problems with alcohol.  (R. at 34.)

### b.   ME Testimony

A medical expert (ME) also testified at the hearing.  (R. at 349–54.)  She testified that Plaintiff had been diagnosed with major depressive disorder and cocaine dependence through LifeNet as well as the Holiner Group.  (R. at 350.)  The ME also noted Plaintiff's history of substance abuse and some drug seeking behavior with Xanax.  (R. at 350–52.)  She disagreed with the diagnosis of schizoaffective disorder, explaining that the diagnosis "ha[d] to be made independent[ly] of substance abuse," and noting that Plaintiff "ha[d] a significant history of drug abuse that was ongoing throughout his treatment."  (R. at 352.)  She noted that Plaintiff tested positive for cannabis in March 2010, and for cocaine in September and November 2009.  She opined that Plaintiff had a mood disorder, depressive disorder, and anxiety disorder.  (R. at 352.)

When the ALJ asked whether the mental impairments would still exist absent the drug use, the ME testified that Plaintiff still might have some anxiety and depression, but not at listing level. (R. at 353.)  She further testified that Plaintiff "would have problems working with the general public due to his anxiety." (*Id.*)  Therefore, Plaintiff's contacts with the public should be limited to superficial contact. (*Id.*)

Plaintiff's attorney then questioned the ME regarding Dr. Letkof's findings in the Mental Impairment Questionnaire for Major Depressive and Bipolar Disorder form, that Plaintiff had schizoaffective disorder, he had no substance abuse problem, and his restrictions of activities of daily living were marked, his difficulties in maintaining social functioning were marked, and his difficulties in maintaining concentration, persistence or pace were extreme.  (R. at 353-54.)  The ME noted that Dr. Lefkof began seeing Plaintiff in September 2010, and acknowledged that those were

Dr. Lefkof's perceptions.  (R. at 353-54.)

### c.    *VE Testimony*

A vocational expert (VE), also testified at the hearing.  (R. at 354-60.)  He classified Plaintiff's past relevant work as a cook (medium and skilled).  (R. at 355.)  The ALJ asked the VE whether someone with anxiety and the restriction of superficial contact with the public could perform Plaintiff's past relevant work as a cook.  (*Id.*)  The VE answered that according to the DOT, the answer was yes, but he personally opined in the negative because the person could come in contact with the public.  (R. at 355–56.)  When the ALJ asked whether there were other jobs that such person could perform, the VE answered in the affirmative and listed the following jobs as examples: (1) a dishwasher (medium, unskilled), with 183,000 jobs nationally and 16,000 jobs in Texas; (2) a laundry worker (medium, unskilled), with 41,000 jobs nationally and 3,000 in Texas; and (3) a hospital cleaner (medium) with 328,000 jobs nationally and 19,000 in Texas.  (R. at 356.)

Counsel then modified the hypothetical to include "moderate" limitations (meaning "at least ten percent of the time") in the ten mental-work related abilities identified by Dr. Chappuis in her consultative RFC assessment.[5]  (R. at 357, 734–36.)  The VE opined that the person would be unable to maintain competitive employment.  (R. at 357.)

## C.    ALJ's Findings

The ALJ issued his decision denying benefits on January 19, 2011.  (R. at 113–24.)  At step one, the ALJ found that Plaintiff met the insured status requirements through March 31, 2009, and had not engaged in substantial gainful activity since April 1, 2005, his alleged onset date.  (R. at

---

[5] These limitations included: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentrating for extended periods; making simple work-related decisions; and completing a normal workday and workweek without interruptions from psychologically based symptoms.  (R. at 734–35.)

118.)  At step two, the ALJ found that Plaintiff had two severe impairments: major depression and a long history of drug abuse in remission.  (*Id.*)  At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal an impairment listed in the regulations.  (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform the full range of work at all exertional levels, and had one nonexertional limitation—"superficial contact with the public."  (R. at 119.)  At step four, based on the VE's testimony, the ALJ determined that Plaintiff was unable to perform any of his past relevant work.  (R. at 122.)  At step five, also based on the VE's testimony, the ALJ determined that Plaintiff could perform the jobs of dishwasher, laundry worker, and hospital cleaner. (R. at 123.)  He therefore concluded that Plaintiff was not disabled at any time between his alleged onset date and the date of the ALJ's decision. (*Id.*)

## D.      New Evidence Before the Appeals Council

Plaintiff appealed the ALJ's decision to Appeals Council on March 7, 2012, and submitted the following new evidence with his request.  (R. at 5–7.)

On October 19, 2011, Plaintiff underwent a consultative mental status examination with psychologist Lee Berryman-Tedman.  (R. at 18–24.)  Dr.  Tedman observed that Plaintiff was very anxious during the interview, and his thinking was tangential and clouded.  (R. at 22.)  Plaintiff was slightly confused and disorganized, and had very poor knowledge "fund."  (R. at 22–23.)  Dr. Tedman opined that his attention, concentration, insight, and judgment were impaired and his short term memory was "extremely" impaired.  (R. at 23.)  He diagnosed Plaintiff with schizoaffective disorder, assessed him a GAF score of 35, and concluded that his prognosis was poor.  (*Id.*)

On November 6, 2011, Matthew Turner, Ph.D., another SAMC, completed a PRTF covering Plaintiff's treatment history from November 6, 2010 through November 6, 2011.  (R. at 281.)  Dr.

Turner diagnosed Plaintiff suffered from schizoaffective disorder and major depressive disorder. (R. at 283–84.)  He opined that Plaintiff had moderate restrictions in his activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation of extended duration.  (R. at 291.)  He also completed a mental RFC assessment.  (R. at 12–13.)  He opined that Plaintiff was markedly limited in 7 mental work-related abilities, including understanding, remembering, and carrying out detailed instructions; was moderately limited in 7 abilities, including asking simple questions and requesting assistance, and was not significantly limited in 6 abilities, including understanding, remembering, and carrying out very short and simple instructions.  (*Id.*)  Dr. Turner concluded that Plaintiff would not be able to work average workday and workweek without interruptions from psychologically based symptoms.  (R. at 14.)

The Appeals Council denied Plaintiff's request for review on May 23, 2012, explaining that the new evidence did "not provide a basis for changing the [ALJ's] decision."  (R. at 1-4.)

## II.  ANALYSIS

**A.**   **Legal Standards**

    **1.**    **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting

*Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).   In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.   A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.   *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.   *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).   Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.   *See id.*   Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.   *See id.* at 436 and n.1.

## 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.   *Leggett*, 67 F.3d at 563-64.   The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.   An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first 4 steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to

the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.     **Issues for Review**

Plaintiff raises two issues for review:

1.     The opinions of treating and examining physicians are entitled to great or controlling weight unless good cause for rejecting or diminishing their weight can be shown. Commissioner rejected the opinions of [Plaintiff's] treating and examining physicians, relying instead on the opinions of the non-examining medical expert. Did the ALJ create reversible error which prejudiced [Plaintiff's] case? [and]

2.     The RFC finding is representative of the most an individual can do in the workplace on a regular can continuing basis. It must be supported by substantial evidence. The ALJ found that [Plaintiff's] only mental limitation was a limitation to only superficial contact with the public despite the more restrictive limitations assessed by the treating and examining physicians in the record. Is the RFC finding supported by substantial evidence when it fails to consider directly contradicting evidence of the limitations caused by [Plaintiff's] impairments?

C.     **Opinion Evidence by Treating and Examining Physicians**

Plaintiff argues remand that is required because the ALJ "improperly accepted the opinion of a non-examining expert over the opinions of multiple treating and examining physicians." (Pl. Br. at 14.)[6] Plaintiff contends that the ALJ erred in rejecting the opinions of Dr. Chavason and Dr. Lefkof, his treating psychiatrists, which were supported by the medical evidence, without performing the six-factor test listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c), or otherwise

---

[6] Plaintiff also argues that the Appeals Council erred in rejecting his petition for review despite the new opinion evidence he submitted with his petition, which "provided further support" for his argument "that his treating and examining physicians' opinions should have been given controlling weight." (Pl. Br. at 20.) The argument relating to the Appeals Council's alleged error involves a different legal analysis.

providing a "meaningful" analysis.(Pl. Br. at 16–21.[7]

### 1.     Treating Physician Rule

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520(b) and 404.1527(c) (2012). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(d). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citing 20 C.F.R. § 404.1527(c)(2)).

If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to the opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating

---

[7] Although Plaintiff lists and briefs his arguments regarding the ALJ's failure to properly consider the opinions of treating and examining physicians together, the opinions of these physicians are addressed separately because these too are subject to different analyses.

physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455.  If evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 455–56.  Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)."  *Id.* at 453 (emphasis in original).  A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458.

Here, the ALJ determined that Plaintiff had the RFC to perform "a full range of work at all exertional levels," and was "limited only to superficial contact with the public." (R. at 119.) At step four, based on the VE's testimony, he found that Plaintiff could not perform his past relevant work. (R. at 122.)  At step five, also relying on the VE' testimony, he determined that Plaintiff had the physical and mental RFC to perform the jobs of dishwasher, laundry worker, and hospital cleaner, and he was therefore not disabled.  (R. at 123.)

In his narrative discussion, the ALJ acknowledged Plaintiff's testimony that "he was fired from his jobs because he was unable to function on the jobs," he experienced "mood swings, and

was unable to get along with people in the kitchen." (R. at 120 , 345.) He likewise acknowledged Plaintiff's allegations that he had no interest in anything, he watched television "but he [did] not look at it," and he did "not have much memory and [got] violent." (R. at 120, 338–39.)

The ALJ next discussed Plaintiff's treatment records, including Dr. Somodevilla's consultative examination on December 10, 2007. (R. at 120.) He pointed to Plaintiff's statements to Dr. Somodevilla that he could do "some chores around his home while his wife work[ed]" but he did "not have the energy to do most of them." (R. at 120, 714–17.) He noted Dr. Somodevilla's observations that Plaintiff's "memory was not significantly impaired," his judgment and insight were "fair," and his prognosis was also fair. (R. at 120, 716–17.)

The ALJ gave "little weight" to Dr. Mount's March 2009 mental impairment questionnaire. (R. at 120–21.) He determined that Dr. Mount's GAF score of 40 and his opinions that Plaintiff was moderately limited in 5 mental work-related abilities, was mildly to moderately limited in one ability, and was markedly limited in 10 abilities, were "inconsistent" with medical record. (R. at 121, 772–79.) He also noted that Dr. Mount failed to state substantial bases for his opinion. (R. at 121.) He declined to give controlling weight on Dr. Chavason's letter dated March 26, 2009, explaining that it was "inconsistent with the medical record, and the letter opined on an issue reserved for the Commissioner. (R. at 121–22.) He also rejected Dr. LefKof's letter dated October 28, 2010, for the same reason as Dr. Chavason's letter. (R. at 121–22.)

The ALJ gave great weight to the ME's testimony that Plaintiff was diagnosed with major depressive disorder and cocaine abuse. (R. at 121, 350.) He found significant the ME's testimony that Plaintiff exhibited "some drug seeking behavior with Xanax" and tested positive for cocaine on November 25, 2009. (R. at 121, 352.) He accepted the ME's testimony that Plaintiff's diagnosis

-18-

of schizoaffective disorder "was not accurate because it should be made independently" from his substance abuse disorder, and that the more accurate diagnoses were mood, depressive, and anxiety disorders. (R. at 121, 352.) He likewise adopted the ME's opinion that Plaintiff's mental RFC should be "limited [from] working with the public due to [his] general anxiety or limited to superficial contact with the public." (R. at 121, 353.) Lastly, while he stated he accepted Dr. Chappuis's consultative RFC assessment as being "consistent with the medical evidence," he did not incorporate any of her mental limitations into his RFC assessment. (*See* R. at 121, 734–37.)

a.    Dr. Chavason's Opinions

The ALJ was entitled to reject Dr. Chavason's statement in his March 26, 2009 disability letter that Plaintiff was "totally disabled" because a determination of disability is not a medical opinion, but rather a legal conclusion that is reserved to the Commissioner. 20 C.F.R. § 404.1527(e); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *see also Jones v. Astrue*, No. CIV.A. H-07-4435, 2008 WL 3004514, at * 3 (S.D. Tex. Aug. 1, 2008) (Although a treating physician's medical opinions are generally accorded great weight, opinions concerning issues reserved to the ALJ's five step analysis (e.g., whether the claimant is "disabled" or only capable of "sedentary work") are neither controlling nor accorded special significance) (citations omitted).

b.    Dr. Lefkof's Opinions

The ALJ could also reject Dr. Lefkof's October 28, 2010 letter, where he stated that Plaintiff could not work due to his mental impairments and other obligations because the statement was not a medical opinion and had "no special significance in the ALJ's determination." *Frank*, 326 F.3d at 620 (citation and internal marks omitted).

Nevertheless, although the ALJ implicitly rejected Dr. Lefkof's diagnosis of schizoaffective

disorder in his October 19, 2010 letter in favor of the ME's opinion that this diagnosis had to be made independently of Plaintiff's substance abuse, the ALJ did not address Dr. Lefkof's statement in his October 28, 2010 letter that Plaintiff had completed a drug rehabilitation program.  (*See* R. at 121, 352, 1204.)  Dr. Lefkof's statement was supported by the fact that Plaintiff's last drug use in the record dated back to April 8, 2010, when he was incarcerated and treated for substance abuse. (R. at 1075, 1131–33.)  The ALJ did not explain, or even acknowledge this conflict in the evidence.

Also absent from the ALJ's discussion was Dr. Lefkof's Mental Impairment Questionnaire dated November 1, 2010.  (R. at 116–24.)  In his questionnaire, Dr. Lefkof opined that Plaintiff was markedly limited in his activities of daily living and maintaining social functioning, and was extremely limited in maintaining concentration, persistence, and pace.  (R. at 1199.)  He opined that Plaintiff had "no useful ability" to perform14 mental work-related functions[8] and was "unable to meet competitive standards" in 10 functions.[9]  (R. at 1200–01.)  He further opined that Plaintiff would be absent from work daily due to his mental disorder and related symptoms.  (R. at 1202.) Dr. Lefkof's opinions regarding Plaintiff's mental abilities despite his drug rehabilitation were based on his two-month treatment of Plaintiff and were corroborated by Dr. Mount's consultative findings on March 17, 2009, that Plaintiff was markedly limited in 13 mental work-related abilities, including understanding, remembering, and carrying out detailed instructions, and was moderately limited in 6 abilities, including asking simple questions and requesting assistance.  (R. at 775–77.)

Although an ALJ may reject a treating physician's opinion when the physician lacks

---

[8] These included: remember work-like procedures, maintain concentration for two-hour segments, work in coordination with or proximity to others without being unduly distracted, and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  (R. at 1200.)

[9] These included: understand, remember, and carry out very short and simple instructions; make simple work-related decisions; ask simple questions; and maintain socially appropriate behavior.  (R. at 1200–01.)

credibility, the ALJ must find "with support in the record, that the physician is not credible and is 'leaning over backwards to support the application for disability benefits.'" *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). Here, the ALJ did not make such a finding with respect to Dr. Lefkof's questionnaire. Moreover, the ALJ was required to perform the six-factor analysis of 20 C.F.R. § 404.1527(c) (1)–(6) before dismissing Dr. Lefkof's questionnaire because his opinions were not conclusory, were not controverted by first-hand psychiatric evidence, and were supported by the record. *See Newton*, 209 F.3d at 453–55. The ALJ did not perform such an analysis, however, given that he never even mentioned Dr. Lefkof's questionnaire in his RFC discussion or in his summary of the evidence. (*See* R. at 116–24.) By failing to evaluate Dr. Lefkof's questionnaire using the 20 C.F.R. § 404.1527(c) (1)–(6) factors, the ALJ committed legal error. *See McNeal v. Colvin*, No. 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (finding legal error where the ALJ implicitly rejected, by failing to even acknowledge, a treating psychiatrist's opinions, and failed to find good cause or conduct a factor-by-factor analysis under 20 C.F.R. §§ 404.1527(c) and 416.927(c)); *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (violation of a regulation constitutes legal error).

### 2.    *Harmless Error*

The Court must still consider whether the ALJ's failure to properly evaluate Dr. Lefkof's questionnaire was harmless. *See McNeal v. Colvin*, 2013 WL 1285472, at *27 (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion under 20 C.F.R. §§ 404.1527(c)). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette*, 466 F. Supp. 2d at 816 (citing *Frank*, 326 F.3d at 622).

In assessing Plaintiff's mental RFC, the ALJ adopted the ME's limitation of "superficial contact with the public." (R. at 119, 353.)  In his hypothetical to the VE, he asked whether a person with anxiety and the restriction of superficial contact with the public could perform his past relevant work or other work existing in the national economy.  (R. at 355–56.)  At step five, based on the VE's testimony, the ALJ concluded that Plaintiff was not disabled because he could perform the jobs of dishwasher, laundry worker, and hospital cleaner.  (R. at 123, 356.)  It is not inconceivable that if the ALJ had considered Dr. Lefkof's questionnaire, he would have imposed additional restrictions on Plaintiff's mental RFC, such as those assessed by Dr. Chappuis, a SAMC.[10]  (*See* R. at 734–36.) Had the ALJ tracked this more restricted RFC in his hypothetical to the VE, it is not inconceivable that a different disability determination would have been reached at step five.  Accordingly, the ALJ's error was not harmless and requires remand.[11]

### III.  CONCLUSION

Plaintiff's motion is **GRANTED in part,** Defendant's motion is **DENIED**, and the case is **REMANDED** to the Commissioner for further proceedings.

---

[10]  In her December 18, 2007 consultative RFC assessment, Dr. Chappuis opined that Plaintiff was moderately limited in 10 mental work-related abilities, including understanding, remembering, and carrying out detailed instructions and maintaining attention and concentration for extended periods. (R. at 734–35.)  When counsel posed a hypothetical with these restrictions, the VE opined that the person would be unable to maintain competitive employment. (R. at 357–58.)  Notably, in his RFC discussion, the ALJ stated that he "accept[ed] the opinion of [Dr. Chappuis]" as being "consistent with the medical evidence of record." (R. at 121.)

[11]  Because remand is required based on the ALJ's failure to properly evaluate Dr. Lafkof's questionnaire, it is unnecessary to reach Plaintiff's other arguments regarding the ALJ's rejection of the examining physicians' opinions and the Appeals Council's failure to remand based on Plaintiff's new medical opinion evidence.  Even if considered, this evidence is largely duplicative of other evidence before the ALJ and merely supports Dr. Lafkof's opinions. (*See, e.g.*, R. at 23-24 (On October 19, 2011, an examining physician Lee Berryman-Tedman opined that Plaintiff's prognosis was poor and that "[h]is social, occupational, and personal functioning [were] severely limited"); R. at 12-14 (On November 6, 2011, a SAMC Matthew Turner, Ph.D. opined that "[Plaintiff] would not be able to work [average workday and workweek without] interruptions from psychologically based symptoms").)

**SO ORDERED**, **on this 30th day of September, 2013.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE